IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CORTNEY HARNESS | ) | CASE NO. |
| 8789 Madison Walnut Road | ) | |
| Pickaway, OH  43103 | ) | JUDGE |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR DAMAGES** |
| | ) | **AND REINSTATEMENT** |
| UNIVERSITY HOSPITALS HEALTH | ) | |
| SYSTEM, INC. | ) | **JURY DEMAND ENDORSED** |
| c/o ACFC INC., Statutory Agent | ) | **HEREIN** |
| 200 Public Square | ) | |
| Suite 2300 | ) | |
| Cleveland, OH  44114 | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Cortney Harness, by and through undersigned counsel, as her Complaint against

the Defendants, states and avers the following:

### PARTIES JURISDICTION & VENUE.

1.    Harness is a resident of the City of Pickaway, County of Pickaway, State of Ohio.

2.    University Hospitals is an Ohio non-profit corporation with its principal place of business

located at 11100 Euclid Ave., Cleveland, Ohio.

### PERSONAL JURISDICTION.

3.    University Hospitals is an Ohio company that contracts with companies in Ohio and owns

or rents property in Ohio. As such, the exercise of personal jurisdiction over University

Hospitals comports with due process.

4.    Harness worked in this judicial district and was terminated from her employment with

University Hospitals in this district.

1

5.  This complaint arises from or relates to the contacts of University Hospitals with Ohio residents, thereby conferring specific jurisdiction over University Hospitals.

## SUBJECT MATTER JURSIDICTION AND VENUE.

6.  This court has subject matter jurisdiction pursuant to 28 U.S.C. 1331 in that Harness is alleging a Federal Law Claim under the Civil Rights Act of 1964, 42 U.S.C. § 2000.

7.  This Court has supplemental jurisdiction over Harness' state law claims pursuant to 28 U.S.C. § 1367 as they are so closely related to her federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

8.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## ADMINISTRATIVE HISTORY.

9.  Within 300 days of the conduct alleged below, Harness filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 532-2020-00108 against University Hospitals.

10. On or about June 15, 2022, the EEOC issued and mailed a Notice of Right to Sue letter to Harness regarding the Charges of Discrimination brought by Harness against University Hospitals in EEOC Agency Charge No. 532-2020-00108.

11. Harness received her Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1) - which has been attached hereto as Plaintiff's Exhibit A.

12. Harness has filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letter.

13. Harness has properly exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## FACTUAL ALLEGATIONS.

14.  University Hospitals operates healthcare facilities throughout the state of Ohio.

15.  Harness is a former employee of University Hospitals.

16.  Harness is female.

17.  Harness identifies as lesbian.

18.  Harness was hired by University Hospitals on November 8, 2011 as a Licensed Practical Nurse ("LPN").

19.  In 2018, Harness transferred from the University Hospitals main campus facility for Rainbow Babies and Children Hospital to the Midtown Women's & Children's Center ("Midtown") located at 5805 Euclid Avenue, Cleveland, Ohio.

20.  At the time University Hospitals transferred Harness transferred to Midtown, Harness was married to a woman.

21.  Harness disclosed her sexual orientation to her supervisor, Nurse Manager Jayme Wiggins.

22.  Harness's coworkers were aware that Harness identified as lesbian, as Harness spoke openly to her coworkers about her wife.

23.  On multiple occasions, Harness's coworkers made discriminatory comments about Harness's sexual orientation.

24.  During her employment with University Hospitals at Midtown, Harness wore her hair short, with one side of her head shaved.

25.  Marjeanette Daniels, an employee at Midtown told Harness that Daniels would not wear her hair like that because Daniels was not gay.

26.  Vernita Reeves, another employee at Midtown, told Harness that her being a lesbian was wrong when Reeves learned Harness is a lesbian.

27. Reeves told Harness that Harness was going to hell for being a lesbian.

28. Reeves continuously made comments to Harness about Reeves' church praying for "gay people" in the hopes that they would find their "true path."

29. Advocating for curing and/or correcting sexual orientation through prayer is a form of discrimination.

30. Harness was offended by Reeves' statements.

31. Harness was subjected to discrimination by her coworkers on the basis of her sexual orientation.

32. Harness's coworkers bullied Harness after learning of her sexual orientation.

33. Harness's coworkers' bullying and/or harassing of Harness in the workplace after learning of her sexual orientation is intentional sex discrimination.

34. Harness's coworkers became intolerant of Harness after learning of her sexual orientation.

35. Harness's coworkers' intolerance of Harness on the basis of her sexual orientation is intentional sex discrimination.

36. Harness reported her coworkers' discriminatory statements to Wiggins ("Reports of LGBTQ+ Discrimination.")

37. Wiggins took no action on Harness' Reports of LGBTQ+ Discrimination.

38. Harness reported her coworkers' discriminatory comments to Human Resources.

39. Human Resources took no action on Harness' Reports of LGBTQ+ Discrimination.

40. Based on University Hospitals policies, Harness's Reports of LGBTQ+ Discrimination were considered to be significant workplace incidents.

41. University Hospitals has a policy and practice of fully investigating significant workplace incidents.

42. University Hospitals has a policy and practice of getting written statements from all participants to significant workplace incidents.

43. University Hospitals has a policy and practice of getting written statements from all witnesses to significant workplace incidents.

44. University Hospitals violated their policy and practice of fully investigating significant workplace incidents regarding Harness's Reports of LGBTQ+ Discrimination.

45. University Hospitals violated their policy and practice of getting written statements from all participants to significant workplace incidents regarding Reports of LGBTQ+ Discrimination.

46. University Hospitals violated their policy and practice of getting written statements from all witnesses to significant workplace incidents regarding Harness's Reports of LGBTQ+ Discrimination.

47. University Hospitals disregarded Harness's Reports of LGBTQ+ Discrimination and failed to take any action with respect to Reports of LGBTQ+ Discrimination.

48. University Hospitals disregard for Harness's Reports of LGBTQ+ Discrimination created a hostile work environment for Harness.

49. After Harness's Reports of LGBTQ+ Discrimination, her supervisors told Harness that she was having communication issues with other employees at Midtown because both Harness's "personality and lifestyle" differed from that of her coworkers.

50. Management referred Harness to their Employee Assistance Program "EAP Referral."

51. Management made the EAP Referral based on her Reports of LGBTQ+ Discrimination.

52. As a result of University Hospital's EAP Referral, Harness was required to disclose to University Hospitals all medications that she was taking.

53. As a result of University Hospital's EAP Referral, Harness was subjected to inappropriate comments by her coworkers.

54. University Hospitals' failure to address Harness's Reports of LGBTQ Discrimination in order to set her up to fail.

55. University Hospitals does not permit employees to have visible tattoos at Midtown.

56. On one occasion, Harness was disciplined for having a visible tattoo.

57. Harness has a tattoo on her forearm that at the time was covered by the jacket that she wore at work.

58. A patient urinated on Harness and Harness was required to take her jacket off.

59. When Wiggins observed Harness's tattoo, Wiggins threw an ace wrap at Harness and told Harness to cover her tattoo.

60. Multiple non-LGBTQ+ employees at Midtown have visible, uncovered tattoos.

61. Based on Harness' own observations, Wiggins permitted non-LGBTQ+ employees at Midtown to have their tattoos visible without consequence.

62. In July 2018, Harness submitted a request to use paid time off for one day.

63. When Wiggins asked why Harness needed the day off, Harness told Wiggins that it was for her wedding anniversary.

64. Wiggins denied Harness's request for paid time off.

65. Upon information and belief, Wiggins did not deny requests for paid time off submitted by non-LGBTQ employees to celebrate their anniversaries.

66. After learning of Harness's LGBTQ+ Orientation, Harness's managers involuntarily changed her work schedule and/or refused to permit Harness to alter her schedule.

67. Harness was not permitted to change her work schedule on the basis of her LGBTQ+ Orientation.

68. Management's refusal to permit Harness to change her work schedule on the basis of her LGBTQ+ Orientation created a hostile work environment for Harness.

69. Harness's work schedule was involuntarily changed on the basis of her LGBTQ+ Orientation.

70. Refusing to permit Harness to change her work schedule, on the basis of her LGBTQ+ Orientation, while permitting Harness's similarly situated coworkers to change their work schedules is intentional sex discrimination.

71. Involuntarily changing Harness's work schedule while not involuntarily changing the work schedules of Harness's similarly situated coworkers, on the basis of Harness's LGBTQ+ Orientation, is intentional sex discrimination.

72. Management's involuntarily changing Harness's work schedule while not involuntarily changing the work schedules of Harness's similarly situated coworkers created a hostile work environment for Harness.

73. A work provider is a supervisory medical professional who can assign and schedule work for LPNs such as Harness.

74. After learning of Harness's LGBTQ+ Orientation, Harness was not permitted to switch work providers while her similarly situated coworkers were permitted to switch work providers.

75. University Hospitals refused Harness the opportunity to switch work providers on the basis of her LGBTQ+ Orientation.

76. Refusing to permit Harness the opportunity to switch work providers on the basis of her LGBTQ+ Orientation is intentional sex discrimination.

77. Management frequently brought Harness into the office to tell her about complaints her coworkers had made about her.

78. Management did not bring Harness's coworkers into the office to discuss Harness's concerns about how she was being treated by her coworkers in her Reports of LGBTQ+ Discrimination.

79. On October 10, 2019, Harness and approximately seven other employees, including Reeves, were responding to a pediatric medical emergency in a hospital room.

80. Harness began administering a breathing treatment to the patient and needed to be at the side of the patient's bed to do so.

81. Harness walked past several coworkers, including Reeves, to get to the head of the patient's bed to begin emergency treatment.

82. As Harness moved, Harness inadvertently brushed against her coworkers, including Reeves, due to the limited space between the bed and the wall.

83. Reeves accused Harness of purposely touching Reeves' buttocks and called her church pastor to Midtown to pray with her as a result.

84. Harness did not touch Reeves' buttocks.

85. Harness did not intentionally touch Reeves as she walked past Reeves.

86. Reeves reported Harness for making unintentional close contact with her while working in close quarters ("Report of Close Contact").

87. Reeves only believed that Harness' bumping into her was sexually motivated because Harness is a lesbian.

88.     Reeves would not have improperly concluded that Harness' bumping into her was sexually motivated if Harness were heterosexual.

89.     Reeves' Report of Close Contact was motived by Reeve's discriminatory animus towards LGBTQ+ people.

90.     Reeves' Report of Close Contact was motived by LGBTQ+ discrimination.

91.     In her Report of Close Contact, Reeves stated Harness used the close proximity as an excuse to make a pass at Reeves.

92.     Harness was not making a pass at Reeves.

93.     Harness spoke to Jordan Javier, Director of the Center, about Reeves's allegation.

94.     Javier was previously aware of Harness's sexual orientation.

95.     Harness told Javier that Reeves assumed that because Harness is lesbian, Harness was making a pass at Reeves.

96.     After Reeves made her Report of Close Contact, Javier told Harness to go home for the rest of the day.

97.     Javier later called Harness to tell her that an investigation was pending and placed Harness was on paid leave.

98.     Harness reiterated to Javier that Harness did not touch Reeves's buttocks, and this report was only made because of Harness's sexual orientation.

99.     Javier permitted Harness to return to work the following day.

100.    On October 11, 2019, Reeves saw Harness at work.

101.    Upon Harness's return, Reeves became extremely upset that Harness was still working at Midtown.

102.  University Hospitals told Harness her schedule would change so she would not be required to work with Reeves.

103.  University Hospitals disciplined Harness as a result of Reeves's Report of Close Contact.

104.  Upon information and belief, University Hospitals did not discipline non-LGBTQ or male coworkers who made close contact with female employees.

105.  Management's discipline of Harness for the Report Of Close Contact on the basis of her LGBTQ+ Orientation is intentional sex discrimination.

106.  On or about October 18, 2019, University Hospitals terminated Harness's employment ("Termination").

107.  University Hospitals terminated Harness as a result of the Report of Close Contact.

108.  Upon information and belief, University Hospitals has a progressive disciplinary policy.

109.  Upon information and belief, University Hospitals' disciplinary policy calls for escalating levels of discipline beginning with a verbal warning, followed by a written warning, suspension, and ultimately leading up to termination.

110.  Harness did not receive a second written warning.

111.  Harness did not receive a suspension.

112.  By terminating Harness, University Hospitals violated its own progressive discipline policy.

113.  University Hospitals' purported reason for Harness's termination is pretext for sex discrimination.

114.  University Hospitals did not proffer a legitimate non-discriminatory reason for terminating Harness.

115. As a result of being constantly harassed and insulted on the basis of her sexual orientation during her employment at University Hospitals, and being wrongfully terminated from University Hospitals, Harness has suffered severe emotional distress, anxiety, and depression.

116. Upon information and belief, subsequent to Harness's termination, University Hospitals hired a non-LGBTQ+ person to replace Harness.

117. The above facts demonstrate that University Hospitals engaged in a pattern and practice of sex discrimination.

118. Harness was terminated on the basis of her LGBTQ Orientation.

119. There was a causal connection between Harness's Disability Discrimination Complaint and University Hospitals' termination of Harness.

**COUNT I: SEX DISCRIMINATION IN VIOLATION OF 42 U.S.C. 2000e-2(a).**

120. Harness restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

121. Harness is a member of a statutorily protected class based on her sexual orientation under 42 U.S.C. 2000e-2(a).

122. University Hospitals was aware that Harness was in a same-sex relationship with her partner during her employment.

123. University Hospitals were aware that Harness failed to conform to stereotypical gender norms during her employment.

124. University Hospitals treated Harness differently than other similarly situated employees based on her sex.

125.    University Hospitals treated Harness differently than other similarly situated employees based on her sexual orientation.

126.    University Hospitals treated Harness differently than other similarly situated employees based on her same-sex relationship.

127.    University Hospitals treated Harness differently than other similarly situated employees based on her failure to conform to stereotypical gender norms.

128.    University Hospitals discriminated against Harness on the basis of her sex throughout her employment with the company.

129.    University Hospitals discriminated against Harness on the basis of her sexual orientation throughout her employment with the company.

130.    University discriminated against Harness on the basis of her same-sex relationship throughout her employment with the company

131.    University discriminated against Harness because she did not conform to stereotypical gender norms during her employment with the company.

132.    University Hospitals terminated Harness's employment without just cause.

133.    University Hospitals terminated Harness's employment based on her sex.

134.    University Hospitals terminated Harness's employment based on her sexual orientation.

135.    University Hospitals terminated Harness's employment based on her same-sex relationship.

136.    University Hospitals terminated Harness's employment because she did not conform to stereotypical gender norms during her employment.

137.    University Hospitals' discrimination against Harness based on her sex violates 42 U.S.C. 2000e-2(a).

138. University Hospitals' discrimination against Harness based on her sexual orientation violates 42 U.S.C. 2000e-2(a).

139. University Hospitals' discrimination against Harness based on her same-sex relationship violates 42 U.S.C. 2000e-2(a).

140. University Hospitals' discrimination against Harness based on her nonconformity to gender norms violates 42 U.S.C. 2000e-2(a).

141. Harness suffered emotional distress as a result of University Hospitals conduct and is entitled emotional distress damages pursuant to 42 U.S.C. 2000e-2(a).

142. As a result of University Hospitals' discrimination against Harness in violation of 42 U.S.C. 2000e-2(a), Harness has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

143. In its discriminatory actions as alleged above, University Hospitals acted with malice or reckless indifference to the rights of Harness, thereby entitling Harness to an award of punitive damages.

144. To remedy the violations of the rights of Harness secured by 42 U.S.C. 2000e-2(a), Harness requests that the Court award her the relief prayed for below.

## **COUNT II: SEX DISCRIMINATION IN VIOLATION OF OHIO R.C. § 4112.02 *et seq.***

145. Harness restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

146. Harness is a member of a statutorily protected class based on her sexual orientation under Ohio R.C. § 4112.02 *et seq.*

13

147. University Hospitals was aware that Harness was in a same-sex relationship with her partner during her employment.

148. University Hospitals were aware that Harness failed to conform to stereotypical gender norms during her employment.

149. University Hospitals treated Harness differently than other similarly situated employees based on her sex.

150. University Hospitals treated Harness differently than other similarly situated employees based on her sexual orientation.

151. University Hospitals treated Harness differently than other similarly situated employees based on her same-sex relationship.

152. University Hospitals treated Harness differently than other similarly situated employees based on her failure to conform to stereotypical gender norms.

153. University Hospitals discriminated against Harness on the basis of her sex throughout her employment with the company.

154. University Hospitals discriminated against Harness on the basis of her sexual orientation throughout her employment with the company.

155. University discriminated against Harness on the basis of her same-sex relationship throughout her employment with the company

156. University discriminated against Harness because she did not conform to stereotypical gender norms during her employment with the company.

157. University Hospitals terminated Harness's employment without just cause.

158. University Hospitals terminated Harness's employment based on her sex.

159. University Hospitals terminated Harness's employment based on her sexual orientation.

160.   University Hospitals terminated Harness's employment based on her same-sex relationship.

161.   University Hospitals terminated Harness's employment because she did not conform to stereotypical gender norms during her employment.

162.   University Hospitals' discrimination against Harness based on her sex violates R.C. 4112 *et seq.*

163.   University Hospitals' discrimination against Harness based on her sexual orientation violates R.C. 4112 *et seq.*

164.   University Hospitals' discrimination against Harness based on her same-sex relationship violates R.C. 4112 *et seq.*

165.   University Hospitals' discrimination against Harness based on her nonconformity to gender norms violates R.C. 4112 *et seq.*

166.   As a result of University Hospitals' discrimination against Harness in violation of Ohio R.C. § 4112.02, Harness has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

167.   In its discriminatory actions as alleged above, University Hospitals acted with malice or reckless indifference to the rights of Harness, thereby entitling Harness to an award of punitive damages.

168.   To remedy the violations of the rights of Harness secured by Ohio R.C. § 4112.02, Harness requests that the Court award her the relief prayed for below.

## COUNT III: HOSTILE WORK ENVIRONMENT ON THE BASIS OF SEX IN VIOLATION OF 42 U.S.C. 2000e-2(a).

169.  Harness restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

170.  During her employment with University Hospitals, Harness was subjected to offensive and harassing conduct by management and her coworkers based on her sexual orientation on an ongoing, weekly basis.

171.  Harness' coworkers regularly made stereotypical comments about members of the LGBTQ community.

172.  Harness reported offensive and harassing conduct by management and her coworkers to University Hospitals.

173.  University Hospitals knew or should have known of the harassing conduct against Harness.

174.  University Hospitals condoned, tolerated and ratified this harassing conduct, and failed to correct it or put a stop to it.

175.  This harassing conduct was severe and/or pervasive.

176.  This harassing conduct was offensive to Harness.

177.  This harassing conduct interfered with Harness's ability to perform her job duties.

178.  Indeed, University Hospital's stated reason for terminating Harness was based entirely on a coworker misperceiving Harness' innocently bumping into her while trying to perform her job duties as sexually motivated because Harness is gay.

179.  University Hospitals' offensive and harassing conduct created a hostile and/or abusive work environment for Harness.

180.  University Hospitals' offensive and harassing conduct created a hostile and/or abusive work environment for the reasonable person similarly situated to Harness.

16

181. As a result of University Hospitals' offensive and harassing conduct towards Harness in violation of 42 U.S.C. 2000e-2(a), Harness has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

182. In its discriminatory actions as alleged above, University Hospitals acted with malice or reckless indifference to the rights of Harness, thereby entitling Harness to an award of punitive damages.

183. To remedy the violations of the rights of Harness secured by 42 U.S.C. 2000e-2(a), Harness requests that the Court award her the relief prayed for below.

## COUNT IV: HOSTILE WORK ENVIRONMENT ON THE BASIS OF SEX IN VIOLATION OF R.C. 4112.02 *et seq.*

184. Harness restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

185. During her employment with University Hospitals, Harness was subjected to offensive and harassing conduct by management and her coworkers based on her sexual orientation on an ongoing, weekly basis.

186. Harness' coworkers regularly made stereotypical comments about members of the LGBTQ community.

187. Harness reported offensive and harassing conduct by management and her coworkers to University Hospitals.

188. University Hospitals knew or should have known of the harassing conduct against Harness.

189. University Hospitals condoned, tolerated and ratified this harassing conduct, and failed to correct it or put a stop to it.

190. This harassing conduct was severe and/or pervasive.

191. This harassing conduct was offensive to Harness.

192. This harassing conduct interfered with Harness's ability to perform her job duties.

193. Indeed, University Hospital's stated reason for terminating Harness was based entirely on a coworker misperceiving Harness' innocently bumping into her while trying to perform her job duties as sexually motivated because Harness is gay.

194. University Hospitals' offensive and harassing conduct created a hostile and/or abusive work environment for Harness.

195. University Hospitals' offensive and harassing conduct created a hostile and/or abusive work environment for the reasonable person similarly situated to Harness.

196. As a result of University Hospitals' offensive and harassing conduct towards Harness in violation of Ohio R.C. § 4112.02, Harness has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

197. In its discriminatory actions as alleged above, University Hospitals acted with malice or reckless indifference to the rights of Harness, thereby entitling Harness to an award of punitive damages.

198. To remedy the violations of the rights of Harness secured by Ohio R.C. § 4112.02, Harness requests that the Court award her the relief prayed for below.

## COUNT V: RETALIATION IN VIOLATION OF 42 U.S.C. §2000e-3.

199. Harness restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

200. Pursuant to 42 U.S.C. §2000e-3, it is an unlawful discriminatory practice for an employer to discriminate against an employee who, "opposed any practice made an unlawful

employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

201.  As a result of the University Hospitals' discriminatory conduct described above, Harness complained to human resources about the discrimination she was experiencing based on her sex and her sexual orientation.

202.  University Hospitals' actions were retaliatory in nature based on Harness's opposition to the unlawful discriminatory conduct.

203.  Defendant violated 42 U.S.C. § 2000e-2 *et seq.* by terminating Harness based on reports of discriminatory treatment based on sex and sexual orientation.

204.  As a result of University Hospital's retaliation against Harness in violation of Ohio R.C. § 4112.02 (I), Harness has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

205.  In its retaliatory actions as alleged above, University Hospitals acted with malice or reckless indifference to the rights of Harness, thereby entitling Harness to an award of punitive damages.

206.  To remedy the violations of the rights of Harness secured by Ohio R.C. § 4112.02(I), Howard requests that the Court award him the relief demanded below.

## COUNT VI: RETALIATORY WRONGFUL TERMINATION IN VIOLATION OF OHIO REVISED CODE § 4112.02(I).

207.  Harness restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

19

208. Pursuant to Ohio R.C. § 4112.02(I), it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"

209. Harness made numerous complaints to University Hospitals about how she being mistreated, harassed, and discriminated against because of her sexual orientation during her employment with University Hospitals.

210. Harness last complained that Reeves' Report of Close Contact was motived by Reeve's discriminatory animus towards LGBTQ+ people.

211. Subsequent to Harness' complaints of discrimination and harassment, University Hospitals took adverse employment actions against Harness by terminating her employment.

212. University Hospital's actions were retaliatory in nature based on Harness' opposition to unlawful discriminatory conduct,

213. As a result of University Hospital's retaliation against Harness in violation of Ohio R.C. § 4112.02 (I), Harness has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

214. In its retaliatory actions as alleged above, University Hospitals acted with malice or reckless indifference to the rights of Harness, thereby entitling Harness to an award of punitive damages.

215. To remedy the violations of the rights of Harness secured by Ohio R.C. § 4112.02(I), Howard requests that the Court award him the relief demanded below.

## **DEMAND FOR RELIEF.**

WHEREFORE, Plaintiff Courtney Harness requests judgement in her favor against

Defendant University Hospitals Health Systems, Inc., containing the following relief:

(a) An order directing Defendant to place Harness in the position she would have occupied but for Defendants' discriminatory treatment of her, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Harness;

(b) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Harness for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

(c) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Harness for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

(d) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Harness for harm to her professional and personal reputation and loss of career fulfillment;

(e) An award of damages for any and all other monetary and/or non-monetary losses suffered by Harness in an amount to be determined at trial, plus prejudgment interest;

(f) An award of punitive damages;

(g) An award of costs that Harness has incurred in this action, as well as Harness's reasonable attorneys' fees to the fullest extent permitted by law; and

(h) Awarding such other and further relief that this Court deems necessary and proper.

Respectfully submitted,

*/s/Chris P. Wido*
Chris P. Wido (0090441)
**SPITZ, THE EMPLOYEE'S ATTORNEY**
25825 Science Park Drive, Suite 200
Beachwood, Ohio 44122
Phone: (216) 291-4744
Fax:     (216) 291-5744
Email:  chris.wido@spitzlawfirm.com

*Attorney for Plaintiff Courtney Harness*

## JURY DEMAND

Plaintiff Courtney Harness demands a trial by jury by the maximum number of jurors permitted.

*/s/Chris P. Wido*
Chris P. Wido (0090441)
**SPITZ, THE EMPLOYEE'S ATTORNEY**